# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| CAMBRIA COMPANY LLC, | Case No. 19-CV-3145 (NEB/TNL) |
| Plaintiff, | |
| v. | **ORDER ON PRELIMINARY INJUNCTION** |
| ADAM SCHUMANN, MOHAWK INDUSTRIES, INC. and DAL-TILE TENNESSEE, LLC, | |
| Defendants. | |

Plaintiff Cambria Company LLC[1] ("Cambria") seeks a preliminary injunction barring its former employee, Adam Schumann, from working at his new employer, Dal-Tile Tennessee, LLC, a subsidiary of Mohawk Industries, Inc. (together, "Mohawk"). [ECF No. 5.] Cambria alleges that without an injunction, Schumann will inevitably disclose confidential information and trade secrets he learned while at Cambria in violation of his confidentiality agreement and state and national trade secrets laws. Cambria also claims that this disclosure amounts to tortious interference with a contract by Mohawk and will unjustly enrich the defendants. Finally, Cambria requests expedited discovery. For the following reasons, the Court denies the preliminary injunction motion and the request for expedited discovery.

---

[1] Cambria also refers to itself as "Cambria Enterprises LLC" in some of its filings. [*Compare* ECF No. 1 ("Compl.") *with* ECF No. 7 ("Pl's Br.").] According to Cambria's Rule 7.1 Disclosure Statement, Cambria Company LLC is wholly owned by Cambria Enterprises LLC. [ECF No. 14.] When the Court refers to Cambria, it refers to both entities.

# BACKGROUND

Cambria and Mohawk are both quartz surface manufacturers. [ECF No. 11 ("Scoggin Decl.") ¶¶ 2, 4.] They create quartz surfaces by crushing quartz, mixing resins and dyes, molding, pressing, curing, cooling, and polishing the surfaces into products, including countertops. (*Id*. ¶¶ 2–4.) Like most quartz surface manufacturers, both companies use Breton Machines to produce the surfaces. (*Id*. ¶¶ 3–5.) The market for quartz surfaces is competitive. (*Id*. ¶ 5.) When a competitor (e.g., Mohawk) "see[s] a market value" in recreating a competitor's (e.g., Cambria's) designs, it does so. [ECF No. 19 ("Baran Decl.") ¶¶ 6–7.] The designs, however, cannot be tested for individual components, and thus they cannot be reverse-engineered. This means that the only way to replicate designs is through trial and error—or, relevant here, to get the recipes from someone who knows them. (Scoggin Decl. ¶ 5; Baran Decl. ¶ 6.)

Cambria has been in the industry for over 20 years and has created over 150 different designs based on its recipes. [ECF No. 21 ("Pl's Reply Br.") at 3, 12 (both citing a sealed declaration).] To achieve the designs, Cambria may make modifications to the Breton Machines it has purchased. [*See* ECF No. 10 ("Grzeskowiak Decl.") ¶ 2; Pl's Br. at 20 ("Cambria utilized and modified the [Breton] technology.")] It considers its recipes and manufacturing processes—including the modifications to the Breton Machines— propriety, confidential, and trade secrets. (*See* Scoggin Decl. 11 ¶¶ 5–6.)

Mohawk is a direct competitor of Cambria. (*Id.* ¶ 5.) It formerly imported its surfaces, but in 2017, it announced plans to open the Dal-Tile Tennessee plant to manufacture quartz surfaces domestically. (*Id.* ¶ 4.) Around that time, Mohawk recruiters began contacting Cambria employees to work at the new plant. (*See id.*) Mohawk maintains it contacted employees from multiple companies, not just Cambria, in order to build a workforce. [ECF No. 18 ("Parker Decl." ¶ 2.]

Schumann worked for Cambria for more than ten years in various roles, including his final position as Assistant Plant Superintendent of the plant where Cambria produces quartz surfaces. (*See* Scoggin Decl. ¶¶ 7–16.) When he began working at Cambria in 2006 as a calibrator, Schumann had no prior experience in the quartz industry. (*Id.* ¶ 7.) He was promoted several times and achieved the position of Production Manager; then he resigned in June 2015. (*Id.* ¶ 14.) After he resigned, he worked for about a year as a plant manager at a plastic and rubber manufacturer. (*Id.* ¶¶ 14–15.) He then returned to Cambria as an Assistant Plant Superintendent in July 2016. (*Id.* ¶ 15.)

As the Assistant Plant Superintendent, Schumann's job responsibilities included ensuring a safe workplace and that the quartz surfaces "were manufactured and finished pursuant to Cambria's particular and unique standards." (*Id.* ¶ 8.) Schumann was not involved in research and development for Cambria. [ECF No. 17 ("Schumann Decl.") ¶ 21.] Schumann's job included marking on a checklist when particular ingredients had been added to the Breton Machines. (*Id.* ¶ 22.) He would also make adjustments to the

machines. (*Id.* ¶ 23.) These adjustments were specific to the recipes, and even within the recipes, the adjustments would vary from day to day. (*Id.*) Mohawk maintains that it is Schumann's "general skills and experience in manufacturing" that make him valuable to Mohawk. (Baran Decl. ¶ 9.)

Because Cambria believed Schumann was exposed to secret information in his role, it had him sign a confidentiality agreement and a two-year non-competition agreement. [*See* ECF No. 11-1, Ex. 3 ("Agreement").] The confidentiality portion of the Agreement is at the heart of this dispute, and states:

> [a.] not disclose to any person or entity any Confidential Information[;] . . .
> [b.] not disclose or transfer any Confidential Information to any third party without the express prior written consent of [Cambria;] . . .
> [c.] deliver to [Cambria] promptly upon termination of [his] employment. . . all memoranda, notes, records (including electronic data records), reports and other documents (and all copies thereof) relating to the Confidential Information . . . .

Agreement ¶ 3. The Agreement identifies Confidential Information as:

> any information which is proprietary or unique to [Cambria], including but not limited to, trade secret information, matters of a technical nature such as processes, devices, manufacturing equipment, techniques, data and formulas, test samples, specifications and characteristics of products planned or being developed, research subjects and results, marking plans and strategies, operations, products, revenues, profits, sales, key personnel, customers, suppliers, pricing policies, any information concerning the business affairs and methods of [Cambria], which is not readily available to the public, and any information [Cambria] has indicated is confidential.

Agreement ¶ 2(b).

In December 2017, Schumann resigned from Cambria and went to work in Owatonna as an operations manager at a wood products manufacturer. (Scoggin Decl. ¶ 16.) Cambria does not argue that the position in wood products manufacturing violated any of Schumann's agreements with Cambria. Cambria also does not claim that Schumann took any physical papers, electronic information, or other physical confidential or trade secret information with him when he left. From December 2017 to late 2019, Schumann worked in Owatonna, and in December 2019, his non-compete with Cambria expired. (*Id.* ¶¶ 16, 18.)

On October 21, 2019, Mohawk hired Schumann to be its Director of Countertop Operations. [*See* ECF No. 17-1, Ex. A.] His first day was December 23, 2019—again, after his non-compete expired. (Schumann Decl. ¶ 2.) His first day in the office was not until January 6, 2020, and his first two weeks were to be an observation period. (Baran Decl. ¶ 11.) As the Director of Countertop Operations, Schumann's responsibilities include:

> (a) defining schedule and forecast requirements with planning, marketing, and logistics; (b) coordinating with research and development team to develop products within production schedule; (c) placing raw material orders consistent with schedule while optimizing the raw material supply chain; (d) coordinating with equipment supplier to execute product plan; and (e) optimizing plan performance through labor, cycle time, and maintenance cost improvements.

[ECF No. 8 ¶ 8.]

Once Cambria learned of Schumann's new job, it requested assurances from Schumann and Mohawk that Schumann would not violate his confidentiality agreement.

[*See* ECF No. 8-1, Ex. 2.] The defendants assured Cambria that it was hiring Schumann for "his general knowledge and expertise" and that he was "able to perform his duties without violating the [Confidentiality] Agreement." (*Id.*, Ex. 3.) Mohawk offered "to instruct Mr. Schumann that [Mohawk] does not desire to receive any confidential information or trade secrets in breach of any obligation to Cambria." (*Id.*) Mohawk then had Schumann sign an agreement to that effect. [*See* ECF No. 19-1.] Cambria did not believe these statements, and commenced this suit, alleging that (1) Schumann will inevitably breach the confidentiality agreement, (2) this breach will disclose trade secrets in violation of Minnesota's Uniform Trade Secrets Act and the federal Defend Trade Secrets Act, (3) by procuring this disclosure, Mohawk will tortiously interfere with the confidentiality agreement, and (4) the defendants will be unjustly enriched by these acts. Cambria moved for a preliminary injunction to enjoin Schumann from working at Mohawk for the pendency of the case and requested expedited discovery.

## ANALYSIS

### I.     Preliminary Injunction Standard

A court must consider four familiar factors in deciding whether to grant a preliminary injunction: (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the movant if the injunction is not granted; (3) the balance between this harm and the injury that granting the injunction will inflict on the other parties; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981).

Preliminary injunctions are extraordinary remedies, and the party seeking such relief bears the burden of establishing its entitlement to an injunction under the *Dataphase* factors. *Watkins Inc. v. Lewis,* 346 F.3d 841, 844 (8th Cir. 2003).

## II.    Likelihood of Success on the Merits

The Court's assessment of the success on the merits is based on the record before it, and the Court is cognizant that discovery and the development of the record could change the likelihood of success. The Court considers each claim in turn.

### A.  Misappropriation of Trade Secrets

Cambria brings two trade secrets claims—one under the federal Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*, and one under the Minnesota Uniform Trade Secrets Act, Minn. Stat. § 325C.01, *et seq.* The Court analyzes the claims together because the statutes have the same purpose and functionally the same definitions for key terms like "trade secret," "misappropriation," and "improper means." *See Midwest Sign & Screen Printing Supply Co. v. Dalpe*, 386 F. Supp. 3d 1037, 1053 (D. Minn. 2019). To prove these claims, Cambria must show that the defendants misappropriated its trade secrets. *See Honeywell Int'l Inc. v. Stacey*, No. 13-CV-3056 (PJS/JJK), 2013 WL 9851104, *5–*6 (D. Minn. Dec. 11, 2013). Misappropriation includes the disclosure or use of a trade secret. *Id.* at *5. A trade secret is information that (1) "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or

use" and (2) "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." *Id.* (quoting Minn. Stat. § 325C.01, subd. 5).

1. *Existence of Trade Secrets*

For the purpose of ruling on its motion, the Court accepts the proposition that Cambria has trade secrets. But on the present record, it does not find that Cambria has identified them with sufficient specificity for the Court to determine what it could enjoin Schumann from disclosing. "To succeed on its trade-secret misappropriation claims, [Cambria] must define its alleged trade secrets with sufficient specificity." *Prime Therapeutics LLC v. Beatty*, 354 F. Supp. 3d 957, 967 (D. Minn. 2018) (citation and quotation marks omitted). And an inability to do so "reduce[s] [Cambria's] likelihood of success on the merits and thus its entitlement to preliminary injunctive relief." *Katch, LLC v. Sweetser*, 143 F. Supp. 3d 854, 869 (D. Minn. 2015).

The difficulty for the Court—and Cambria—is that Cambria's definition of the trade secrets at issue is a shifting target. In its complaint, Cambria defines its trade secrets broadly, including "details related to the necessary steps to produce its quartz surface products such as: (1) mixing specific raw material ingredients; (2) combining; (3) dispensing and molding; (4) pressing; (5) curing; (6) cooling; and (7) polishing." (Compl. ¶ 58.) In its briefs, Cambria defines its trade secrets as including "the secret ingredients used in the recipes, certain equipment and supplies, and the precise processes by which the ingredients are mixed, cured, finished, and delivered to customers." (Pl's Br. at 20.) It

also defines them as "formulas/recipes, techniques, methods and processes" and "recipes and particular applications and modifications to the Breton equipment and processes." (Pl's Reply Br. at 8.) At oral argument, Cambria asserted for the first time that its trade secrets included a four-ingredient recipe that is easily memorized and impossible to get out of an employee's head. Yet nothing in the record before the Court includes support for this last proposition. Cambria's broad and changing definitions make it difficult for the Court to determine the bounds of any trade secrets Schumann might disclose.[2]

Identification of the trade secrets is particularly important here, where there is no allegation that Schumann took any physical information from Cambria, or that he behaved inappropriately in leaving Cambria. And Schumann has denied repeatedly and under oath that he remembers any confidential information or trade secrets from his time at Cambria, which is now two years in the rear-view mirror. (*See* Schumann Decl. ¶ 22 ("I do not remember those recipes at all."); *Id.* ¶ 23 (". . . even if I remembered what those specific adjustments were, which I don't . . ."); *Id.* ¶ 24 ("I have no recollection of being involved in the sourcing process at Cambria."); *Id.* ¶ 25 ("I do not remember it; or if I do remember it, I have already certified that I will not disclose it to Mohawk.").) At this

---

[2] The Court understands that Cambria may be hesitant to provide the Court with the specifics of their trade secrets, but this does not excuse it of the burden at this stage in the litigation of establishing that the trade secrets exist. *See, e.g., Int'l Bus. Mach. Corp. v. Seagate Tech., Inc.*, 941 F. Supp. 98, 100 (D. Minn. 1992) (analyzing documents filed under seal to determine if they qualify as trade secrets).

stage, the Court cannot determine that any relevant trade secrets will be misappropriated because there is insufficient evidence that Schumann knows any.[3]

2. *Inevitable Disclosure of Trade Secrets*

Cambria's theory in this case rests on the inevitable-disclosure doctrine, under which employment with a competitor threatens inevitable disclosure, and future misappropriation, of trade secrets. Minnesota Courts and the Eighth Circuit have neither accepted nor rejected the doctrine. *Prime Therapeutics*, 354 F. Supp. 3d at 957 (explaining the doctrine's origins). The doctrine, however, has been the subject of several cases in this district. *See, e.g.*, *Katch*, 143 F. Supp. 3d at 873 (denying a preliminary injunction sought under the theory of inevitable disclosure because the plaintiff had not shown "the high degree of probability of inevitable disclosure necessary to invoke that doctrine"); *Prime Therapeutics*, 354 F. Supp. 3d at 970 (same); *Honeywell*, 2013 WL 9851104, at *6–*7 (same). The Court here assumes without deciding that the inevitable-disclosure doctrine could be appropriately applied in the correct case. This is not such a case. Under the doctrine, to prove its trade secrets claims, Cambria must demonstrate that Schumann will inevitably disclose the trade secrets at issue. The burden here is even higher than that ordinarily required on a preliminary injunction. Cambria "must demonstrate a high degree of probability of inevitable disclosure." *Katch*, 143 F. Supp. 3d at 869 (citation and

---

[3] Cambria argues that the Court should not believe Schumann's affidavit. As discussed below, at this point there is no reason for the Court to find Schumann not credible.

quotation marks omitted). "Mere knowledge of a trade secret is not enough, even where the person with such knowledge takes a comparable position with a competitor." *Id*. at 870. Even if the Court were to accept that relevant trade secrets exist and that Schumann knows them, on this record, it could not find that disclosure is inevitable.

Cambria makes three assertions to demonstrate inevitable disclosure: (1) Schumann has a history of disclosing confidential information; (2) Mohawk recruited Cambria employees for its new plant; and (3) Schumann lied to Cambria about accepting the Mohawk position.

For Schumann's history of disclosure, Cambria points to three events where Schumann allegedly disclosed trade secrets. First, in 2012, a subordinate of Schumann allowed a Breton representative into a restricted area of the plant. (Grzeskowiak Decl. ¶ 3.) Schumann does not remember this encounter and "[has] no idea what [Cambria] is talking about." (Schumann Decl. ¶ 27.) Second, in 2016, a Breton representative told Cambria that Schumann told Breton about Cambria's equipment modifications. Schumann again "[has] no idea what [Cambria] is talking about." (*Id*. ¶ 26.) Finally, Schumann posted two comments on LinkedIn in 2018 under pictures of quartz surfaces reading "[l]ooks like a pretty wet mix, nice" and "[l]ooks an awful lot like Britannica from Cambria." [ECF No. 9-1, Exs. 1, 2.] The Court finds no pattern of disclosure of trade secrets in these three events, and they do not assist Cambria in its quest to meet the high burden of inevitable disclosure.

Next, Cambria points to Mohawk's recruiting of its high-level employees as evidence that Mohawk's purpose in hiring employees was to learn Cambria's confidential information. Mohawk directly contradicts this assertion with two affidavits. The affidavits swear that Mohawk "did not (and does not) target Cambria employees for hire, and certainly did not target Cambria employees in order to gain access to Cambria confidential information or trade secrets. We don't want or need that information." (Parker Decl. ¶ 3.) Further, Mohawk "has no expectation that [Schumann] will use or disclose any Cambria confidential or proprietary information in his work," (Baran Decl. ¶ 9), and had him sign an acknowledgement to that effect. [*See* ECF No. 19-1 (signed acknowledgement).] When weighing the defendants' statements that are signed under penalty of perjury against Cambria's characterization of the events, the Court does not find that disclosure is inevitable. *See, e.g.*, *Katch*, 143 F. Supp. 3d at 871 (finding that when defendants confirmed under oath, they did not seek disclosure of information, disclosure was not inevitable).

Finally, Cambria points to Schumann's statement to a Cambria executive that he had not accepted the position at Mohawk when he in fact done so. Cambria says this "lie" is evidence of Schumann's intent to disclose confidential information to Mohawk. Schumann disputes this account of the conversation. (*See* Schumann Decl. ¶ 28.) The Court "does not find much evidence of nefarious intent in a single 'white lie' of the type that departing employees commonly tell their colleagues." *Honeywell*, 2013 WL 9851104,

at *6. Indeed, when Schumann allegedly made this statement, he was not an employee of Cambria, had not been an employee for nearly two years, and had fully complied with his non-compete. He was not required to keep Cambria abreast of his activities, and the dueling affidavits about what he told a former co-worker do not demonstrate an intent to disclose information he learned at Cambria.

In sum, "[a]ny trade secret that [Schumann] possesses is in his head, and he cannot help but take it with him." *Honeywell*, 2013 WL 9851104, at *6. Putting aside that Cambria has not shown trade secrets to be in Schumann's head, courts do not grant injunctions when the only trade secrets are in the employee's head and the company has not demonstrated a high probability of inevitable disclosure. *See, e.g., id.*; *Katch*, 143 F. Supp. 3d at 870–73; *Midwest Sign*, 386 F. Supp. 3d at 1054. The Court finds, on this record, that Cambria is unlikely to succeed on the merits of its trade secrets claims under the inevitable-disclosure theory.

### B. Breach of Contract

To prove its breach of contract claim, Cambria must show "(1) a valid contract; (2) performance by the plaintiff of any conditions precedent; (3) a material breach of the contract by the defendant; and (4) damages." *Russo v. NCS Pearson, Inc.*, 462 F. Supp. 2d 981, 989 (D. Minn. 2006). The parties agree that the Agreement is a contract and the defendants do no dispute that Cambria has performed under the Agreement. The parties center their arguments on whether Schumann has materially breached the Agreement.

Cambria argues that Schumann already breached the Agreement in Paragraph 11 of his Declaration. In Paragraph 11, Schumann states:

> First of all, Cambria has five processing (or soft) lines for manufacturing quartz surfaces, and three polishing lines. Lines 1 and 2 are the oldest lines at Cambria, and to the best of my knowledge, these are the two lines that Cambria significantly modified from the standard Breton equipment. I did not work on Lines 1 and 2 after they were modified. Because I never worked on these two lines after they were modified, I have no knowledge of how Cambria modified this equipment—I only know that I was told they modified it. Significantly, Cambria's best-selling line of quartz surfaces was produced on a Line I never worked on after it was modified.

(Schumann Decl. ¶ 11.) Cambria argues that this statement divulges its confidential information by disclosing that Cambria has five processing lines, at least two of the lines are modified, and its best-selling line is made on a modified line. The Court is not convinced that this information is confidential. As Mohawk argued at the hearing, Cambria's CEO has publicly disclosed that Cambria has five lines. Further, Cambria has asserted throughout this litigation that some of its lines are modified. (*See, e.g.,* Grzeskowiak Decl. ¶ 2; Pl's Br. at 20 ("Cambria utilized and modified the [Breton] technology.").) Finally, the fact that a specific surface is made on a modified line would seem obvious when Cambria has asserted that its entire process, including its lines, are modified. (Pl's Reply Br. at 3–5 ("Cambria has implemented proprietary modifications to every step of the manufacturing process").) Because this information is likely not confidential, the Court concludes that Cambria is not likely to succeed on the claim that Schumann has already violated his confidentiality agreement.

Next, Cambria makes its inevitable-disclosure argument on the breach of contract claim, contending that Schumann will inevitably breach the Agreement because he will inevitably disclose trade secrets. Just as Cambria is unlikely to succeed on the merits of its trade secrets claims under this theory, it is also unlikely to succeed on an inevitable breach of contract claim. *See, e.g.*, *Midwest Sign*, 386 F. Supp. 3d at 1054 (finding that when breach of contract and inevitable disclosure of trade secrets claims are closely related, if one is unlikely to succeed on the merits, so is the other.)

### C.  *Tortious Interference*

To succeed on its tortious interference claim, Cambria must show "(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages." *CPI Card Grp., Inc. v. Dwyer*, 294 F. Supp. 3d 791, 816 (D. Minn. 2018) (quoting *E-Shops Corp. v. U.S. Bank Ass'n*, 678 F.3d 659, 664 (8th Cir. 2012)). The parties agree that the Agreement is a contract and that Mohawk knew about it. Cambria argues that Mohawk will procure Schumann's breach of the Agreement by having him disclose Cambria's confidential information. This means the likelihood of the success on the merits of this claim is tied to the likelihood of success of the inevitable disclosure breach of contract claim. Mohawk has stated under oath that it does not seek to procure the breach of the Agreement. (*See* Parker Decl. ¶ 3; Baran Decl. ¶ 9; ECF No 19-1.)   Because Cambria's theory for its claim is directly

contradicted by the affidavits, at this point, the Court does not find the claim for tortious interference likely meritorious.

### D. Unjust Enrichment

To succeed on an unjust enrichment claim, Cambria must demonstrate that the defendants "knowingly received or obtained something of value for which the defendant in equity and good conscience should pay." *ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc.*, 544 N.W2d 302, 306 (Minn. 1996) (citation and quotation marks omitted). Cambria does not explain why its unjust enrichment claim is likely to succeed. "[T]he party requesting the injunctive relief bears the 'complete burden' of proving all the [*Dataphase*] factors." *Hypred S.A. v. Pochard*, No. 04-CV-2773 (JNE/JGL), 2004 WL 1386149, at *1 (D. Minn. June 18, 2004). Here, based on the record, the Court does not find Cambria has demonstrated a likelihood of success on this claim.

Cambria has failed to establish a likelihood of success on the merits for any of its claims against the defendants. "This failure alone warrants denying its requested preliminary relief." *Katch*, 143 F. Supp. 3d at 874 (citing *CDI Energy Servs., Inc. v. W. River Pumps, Inc.*, 567 F.3d 398, 402 (8th Cir. 2009) ("the absence of a likelihood of success on the merits strongly suggests that preliminary injunctive relief should be denied.")). In the interest of completeness, the Court considers the remaining *Dataphase* factors.

### III.     Threat of Irreparable Harm to the Movant

"Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). "The harm must be *likely* in the absence of an injunction, great, and of such imminence that there is a clear and present need for equitable relief." *Midwest Sign*, 386 F. Supp. 3d at 1055 (citations and quotation marks omitted, emphasis in original). A plaintiff must show more than a future risk of irreparable harm; "[t]here must be a clear showing of immediate irreparable injury." *Berkley Risk Admins. Co., LLC v. Accident Fund Holdings, Inc.*, No. 16-CV-2671 (DSD/KMM), 2016 WL 4472943, at *4 (D. Minn. Aug. 24, 2016) (citation and quotation marks omitted). "Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." *Watkins Inc.*, 346 F.3d at 844; *see also Gamble v. Minn. State Indus.*, No. 16-CV-2720 (JRT/KMM), 2017 WL 6611570, at *2 (D. Minn. Dec. 1, 2017) (collecting cases).

The Agreement provides the parties agree "that any such violation or threatened violation will cause irreparable injury to [Cambria] . . . and that monetary damages will not provide an adequate remedy." (Agreement ¶ 10.)  The Court may consider this as some evidence of irreparable harm. *See, e.g., CPI Card Grp.*, 294 F. Supp. 3d at 817. The Minnesota Supreme Court, however, has recognized that "parties do not have the capacity to direct the court's exercise of equitable powers," and that a private

employment agreement "cannot resolve the legal questions that require an exercise of judicial authority." *St. Jude Med., Inc. v. Carter*, 913 N.W.2d 678, 684 (Minn. 2018) ("The decision to exercise a court's equitable authority—or not to do so—rests with a judge, not in drafting decisions made in contract negotiations.").

Further, Cambria's entire argument for irreparable harm is that Schumann will inevitably disclose the confidential information. As discussed above, Cambria has not demonstrated that disclosure is inevitable. The evidence Cambria has provided is based on its own speculation and cannot support a preliminary injunction: speculative harm cannot equal irreparable harm. *See, e.g., Katch*, 143 F. Supp. 3d at 873 ("The Court will not use an injunction 'simply to eliminate a possibility of remote future injury, or a future invasion of rights' or to allay [Cambria's] fears and anxieties about [Schumann] working for [Mohawk]." (citation omitted).) "[T]he Court determined already that [Cambria] has not shown a likelihood of inevitable disclosure. Just as that determination leads to the conclusion that [Cambria] is not likely to prevail on the merits, it warrants the conclusion that [Cambria] has not shown that legally cognizable harm is likely." *Prime Therapeutics*, 354 F. Supp. 3d at 974.

## IV.    Balance of Harms Between Parties

When the Court considers the balance of harms, it must "assess the harm the movant would suffer absent an injunction, as well as the harm other interested parties and the public would experience if the injunction issued." *Katch*, 143 F. Supp. 3d at 875.

Even if the Court were to accept Cambria's argument that it would be harmed by a future disclosure of confidential information, this harm does not outweigh the present burden the defendants would face. If the injunction were granted, Schumann would be barred for the duration of this litigation from working in the job of his choice and would need to find a new job—a significant harm. *See, e.g., id.* at 876 (finding balance of the harms weighed in favor of employee who was at risk of losing employment if injunction issued); *Honeywell*, 2013 WL 9851104, at *7 (same). Effectively, the injunction would serve as an unwarranted extension of the two-year non-compete agreement, if not a permanent non-compete. Schumann has already fully complied with his two-year non-compete. The balance of the harms weighs in favor of the defendants. *See Standard Oil Co. v. Bertelsen*, 243 N.W. 701, 703 (Minn. 1932) ("A man's right to labor in any occupation in which he is fit to engage is a valuable right, which should not be taken from him, or limited, by injunction, except in a clear case showing the justice and necessity therefor.")

## V.    Public Interest

The Court must weigh the public interest in deciding whether to issue the injunction. Public interests often compete with each other in the context of restrictive covenants in employment contracts. The public has a strong interest in preserving and fostering business competition. *See Lasermaster Corp. v. Sentinel Imaging*, 931 F. Supp. 628, 637 (D. Minn. 1996) (noting "compelling interests regarding policies encouraging competition through the liberal exchange of ideas and information"). But this same

interest does not extend to unfair competition. *See Millard v. Elec. Cable Specialists*, 790 F. Supp. 857, 863 (D. Minn. 1992) ("Restraining unfair competition does not violate public policy."). Public interest favors "the enforcement of valid business agreements and the protection of legitimate business interests in an industry propelled by vigorous but fair competition." *Boston Scientific Corp. v. Duberg*, 754 F. Supp. 2d 1033, 1042 (D. Minn. 2010) (citation omitted).

Contrary to Cambria's assertions, the record does not contain strong evidence of unfair conduct leading to unfair competition. Schumann and Mohawk honored the terms of the non-compete and have stated repeatedly and under oath that they do not seek to violate the confidentiality agreement—more evidence that this conduct is not unfair. The competition alleged, based on the facts so far in the record, appears within the realm of acceptable business practice. The public interest factor does not weigh in favor of granting the injunction.

## VI. Expedited Discovery

With its motion for a preliminary injunction, Cambria filed a motion to expedite discovery. In a case such as this, expedited discovery is typically only granted to serve one of two purposes. *Midwest Sign*, 386 F. Supp. 3d at 1057–58. The first purpose, to further develop the record before the preliminary injunction hearing, is not served here. *See id.* at 1058. The parties already created a robust record without discovery, and the Court does not need more information to assess the merits of the requested injunction.

The second purpose, to "prevent irreparable harm while at the same time granting a motion for a preliminary injunction," is also not served. *Id.* (citation omitted). The irreparable harm assessment for expedited discovery is different than for a preliminary injunction. *Id.* The Court assesses the likelihood the parties will interfere with this litigation, rather than the alleged misconduct underlying the litigation. Here, the parties have implemented litigation holds, and as discussed above, there is no reason to believe the defendants will destroy evidence or otherwise interfere with discovery. Because there is no compelling reason to grant expedited discovery, the Court denies this request.

## CONCLUSION

Based on the foregoing and on all the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT Cambria's motion for a preliminary injunction and for expedited discovery [ECF No. 5] is DENIED.

Dated: January 23, 2020                               BY THE COURT:

                                                      s/Nancy E. Brasel
                                                      Nancy E. Brasel
                                                      United States District Judge